ROBERTS, J.,
for the Court:
¶ 1. This appeal stems from the Lowndes County Chancery Court’s final judgment entered on January 6, 2011, finding Adam Lucas unfit as a natural parent and granting custody of his two sons, Tyler and Cody, to their maternal grandparents Jeannie and John Hendrix (Hendrix-es). Feeling aggrieved, Lucas appeals. We affirm the chancellor’s decision.
FACTS AND PROCEDURAL HISTORY
¶ 2. Lucas and Shannon Moore were involved in a romantic relationship that resulted in the birth of their sons Tyler in 1999 and Cody in 2001. Lucas and Moore never married; but according to the chancellor’s final judgment, paternity of Tyler and Cody had been adjudicated, and Lucas was the natural father of the two boys. After Lucas and Moore ended their relationship, Moore became the primary caregiver for Tyler and Cody. Moore, Tyler, and Cody lived with the Hendrixes. Moore died in October 2005. After Moore’s death, Lucas took over as primary caregiver for the boys with much assistance from the Hendrixes. Lucas married Heather Lucas, who had three children from a prior relationship. Lucas, Heather, her three children, Tyler, and Cody all lived together in a three-bedroom trailer home in Columbus, Mississippi. Lucas and Heather shared a room, Heather’s two girls shared another room, and Lucas’s two boys and Heather’s son shared the last room. Tyler and Cody frequently saw the Hendrixes during the week and often stayed overnight on weekends. It is undisputed that the Hendrixes were an important part of the boys’ lives.
¶ 3. Then, on August 6, 2010, the Hen-drixes filed a petition for custody alleging Lucas’s behavior was “unstable” and ex *701 posed Tyler and Cody to “inappropriate habits and lifestyles.” They also alleged that Tyler and Cody were severely neglected. In their petition, they sought legal and physical custody of the boys, with Lucas to have supervised visitation. They did not seek termination of Lucas’s parental rights. Lucas filed an objection to the Hendrixes’ petition for custody on November 3, 2010. A hearing on the Hendrixes’ petition was held in the chancery court on November 5, 2010, and November 19, 2010.
¶ 4. At the hearing, Jeannie’s attorney called several witnesses to testify; Jeannie testified first. She discussed a variety of issues regarding Lucas’s home and parenting skills. First, she testified that the Lucases’ home was cramped and filthy. She claimed that Lucas and Heather allowed several pit bulls inside the home, and she had seen dog feces and vomit left all over the home’s floors. Jeannie testified the Lucases’ home had a “puke, ammonia smell,” and she had even smelled that on the boys. She provided pictures of Tyler and Cody with sores on their legs and arms. Jeannie also described at least eleven times that Tyler and Cody had asked her to bring them food because they were hungry. She further indicated that the children are often unsupervised after school and that Lucas provided no help with homework or school projects. Jeannie had even paid for school supplies, clothes, medical bills, and baseball registration fees for both boys. Jeannie also expressed concern over Lucas’s alcohol consumption and cited instances of Lucas’s decisions to drive under the influence of alcohol.
¶ 5. Rachael Lucas, Lucas’s sister-in-law, testified that she loved Lucas, but sometimes his priorities were misplaced in that he puts some of his wants above the boys wants and needs. She provided, as an example, a time Lucas claimed he had no money to buy'the boys a Halloween costume; however,- she saw that he did have money to buy beer. She also testified that she had seen him intoxicated on previous occasions and that his drinking had increased since the death of his father. Rachael also expressed concern over an incident on July 4, 2009, where she witnessed both Lucas and Heather intoxicated and then driving the children home while still intoxicated. Rachael indicated that although she had not been in the Lucases’ home very often, when she was there, nothing seemed out of order or abnormal. Next, Jeannie’s attorney called Lonnie Lucas, Lucas’s brother, to testify. Lonnie confirmed that he, too, .had seen Lucas consume alcohol and become intoxicated, but he had never witnessed Lucas use any other drug. He did testify that Lucas had called him one time to ask’ if he could get some prescription pain medication for a hand injury. Lonnie stated that Lucas did not “say what he was going to do with [the medication],” but Lonnie had “heard that people sell [it].”
¶ 6. Jeannie’s attorney next called Lindsay Price, Tyler’s school teacher, and Emily McGaha, Cody’s school teacher, to testify. Price teaches Tyler’s math class and is his homeroom teacher. She stated that Tyler “seemed very uninterested in class work.” She testified that she called the Lucas home to discuss her concerns about his school performance and spoke with Heather. Heather assured Price that she would work with him and would try to get his grades pulled up. Price noted that Tyler has improved his grades during the most recent school session, but he was currently failing two classes for the school year and close to failing two more classes for the school year. Price testified that Lucas never called her to discuss Tyler’s school performance. Price further explained that she generally has no behavior *702 al issues with Tyler except that “when he is there, he comes in[;] he sits in his desk[;] he is polite[,] but he doesn’t talk[;] he doesn’t talk to me[;] he doesn’t talk to anybody. He just sits in his desk.” Tyler would also not take any notes while in class and was frequently absent or tardy. McGaha is Cody’s third-grade teacher. McGaha stated that Cody is barely passing her class. Initially, she called Jeannie to express concern about Cody’s homework issue and its impact on his grade, but Jeannie informed her that Cody lived with Lucas. McGaha testified that she then called Lucas about three times to discuss Cody’s failure to complete multiple homework assignments. McGaha explained the issues would be fixed only for a short time before resuming. She also explained that there have been several occasions Cody did not have a snack at snack time, and either she or his friends will share a snack with him. Additionally, she spoke of at least one day when she could tell Cody had not bathed because she could smell him.
¶ 7. Tyler was called as a witness. He stated that one of the pit bulls in the home had bitten him, but it was not a serious bite. Also, he explained, the kids have to clean up the dog feces in the house. Sometimes it is not cleaned up for a few days because he feels like Lucas and Heather should be cleaning it up instead. When asked about his poor performance in school, Tyler testified: “Like every day, they (Heather and Lucas) will like [sic] argue[,] and when I am trying to take a test, I think of all the arguing and stuff.” Tyler next explained that he had seen Heather give Josh Williams, a family acquaintance, some pills in exchange for money. In regard to any inappropriate behavior on Lucas’s part, Tyler testified that he had seen him sell some pills and that Lucas often drinks too much. Tyler also claimed that Lucas had given him some vodka and orange juice on one occasion and some beer on another occasion. He remembered riding home from a football game with Lucas after Lucas had been drinking. Tyler also admitted that he had smoked cigarettes before, and he received cigarettes from his thirteen-year-old stepsister, who also smokes. Tyler confirmed that Jeannie brings them food because they are hungry and that only Lucas gets to eat when there is no food. The chancellor asked Tyler to explain how he received several scratches and bruises depicted in a photograph entered into evidence. Tyler told the chancellor: “When we were living at Cypress Park ... this boy[,] he came up and pushed me. And I didn’t want to push him back, so my dad told me to hit him, and I didn’t want to. So he (the other boy) just started scratching me and hitting me.” When Tyler indicated that he did not want to fight, Tyler claimed Lucas said he was going to whip him for not fighting.
¶8. Jeannie’s attorney next called both Heather and Lucas to testify as adverse witnesses. Heather testified first. Heather explained that there have been instances in which the electricity to their home had been cut off, but it was because the thermostat and meter were broken and produced an excessively high bill. Heath was asked on direct examination, “[D]o you recall telling ... some other people that you thought that [Lucas] should not have custody ... ?” She responded that she had never said that, but she acknowledge that she had said that “there should be things done different.” Heather further elaborated that Lucas should spend more time with the boys instead of them spending so much time with the Hendrix-es. Heather also indicated that she and Lucas often buy school clothes and supplies for the boys when needed; however, she said that she had bought school supplies for the boys the previous year that were never used because Jeannie had al *703 ready bought supplies. Heather adamantly disputed Jeannie’s testimony that dog feces are allowed to sit on the floor for a couple of days without being cleaned up. Additionally, Heather testified that the boys have lots of things to play with, including video games and a four-wheeler, and that there is plenty of food in the home.
¶ 9. Next, Lucas testified as an adverse witness. When asked whether Tyler and Cody are not given sufficient food, Lucas stated: “If [it is] not Taco Bell or Mc-Donalds on our stove, that [does not] mean we don’t have food because that’s all they like to eat.... [W]e got food at home.” Lucas also admitted he was charged with possession of cocaine in 2008, but the charge was expunged from his record after he completed drug court. Lucas also admitted he has been charged at least two times for driving under the influence (DUI) and has been involved in a number of fights. He explained that he goes to counseling on Thursdays and Alcoholics Anonymous meetings once every two weeks, but he acknowledged he occasionally relapses. Lucas conceded that he does not have the most steady employment and has received unemployment benefits from time to time, but he claimed he was currently employed as a maintenance worker and was filling out applications for jobs on a regular basis. He testified that he was aware of Tyler’s and Cody’s school issues, but he attributed some of these issues to the boys’ failure to show him their homework and letters from school. After Lucas’s testimony, the Hendrixes’ attorney rested their case.
¶ 10. Lucas, through his attorney, presented his case-in-chief beginning on November 19, 2010. Mary Lucas McDill, Lucas’s mother, was first to testify. She testified that Lucas and Heather kept a clean home and that the boys were adequately fed and cared for by Lucas and Heather. Next, Joanne Williams testified, followed by Rebecca Plumb. Both Williams and Plumb are Lucas’s aunts. Both described Lucas as an involved father and a good parent. Lucas again took the stand, and he testified that he was surprised by some of the prior testimony, including that the boys went to school without snacks and that they sometimes smelled as if they had not bathed. He also testified he spends a lot of time with them doing things outside, such as fishing and riding four-wheelers. On cross-examination by Jeannie’s counsel, Lucas stated: “I’ve been a real good daddy. I fought for them. Before all this, I fought for them and took them and- got my visitation rights, too.” The chancellor had additional questions for Lucas and Jeannie. In response to the chancellor’s question, Lucas explained that he had two dogs in his home and the rest had been sold. He also stated that any dog feces in the home are cleaned up and did not remain on the floor for an extended period of time. The chancellor asked him to describe a typical school day in his household. Lucas testified that the boys get up around 6:30 a.m. to eat breakfast and clean themselves up for school. They take the bus to school and get home around 3:30 p.m. Then, they eat a snack, complete their homework, and play outside until dinner. Lucas testified that the boys’ grades at school have improved and that their absences have decreased. He also elaborated on his work history: for Brislin for approximately one and one-half years; for Kerr McGee for approximately two months; for Lucas Electric for approximately two months; for Danny Cameron for approximately seven months doing maintenance; for Dent Masters for approximately five to six months; and again for Danny Cameron presently.
¶ 11. On rebuttal, Jeannie again took the stand and testified she overheard an *704 argument between Lucas and Heather involving foul language when she was on the phone with one of the boys. Shortly after she overheard the argument, Lucas called her at 11:00 p.m. and asked to bring the boys over to her house. She also testified that on several occasions both Lucas and Heather complained about things the other was doing. Lucas’s attorney asked if Jeannie ever reported any of her concerns about the boys’ treatment and Lucas’s behavior to police or the Department of Human Services. She said that she had not.
¶ 12. At the end of trial, the chancellor issued a bench opinion and stated the following:
[W]e have what’s known as the best interest of the child analysis called the Albright factors, but they don’t apply when a third party seeks custody and as a general rule, the third party must prove by clear and convincing evidence that the natural parent has either abandoned the child, is unfit to have eusto-dy[,] or has engaged in conduct that’s so immoral as to be detrimental to the child.
The [chancery] court may award custody to a third party over a parent if third party custody is in the child’s best interest[,] and the parent is unfit or abandons the child or constructively abandons the child or has relinquished legal custody of the child.
[[Image here]]
And what is unfitness and immoral conduct that is detrimental to the children? It is conduct that presents a genuine serious danger to the child; it is behavior that clearly causes danger to the mental and emotional well being of a child.
The chancellor further stated in her bench opinion that “based on the clear and convincing evidence ... the father is unfit for custody of these two boys.” She granted Lucas visitation.
¶ 18. The final judgment in this matter was entered on January 6, 2011, in which the chancellor elaborated on the grounds for her decision to find Lucas unfit as a parent, grant him visitation, and grant custody of Tyler and Cody to the Hendrixes. She explained that the Hendrixes provided a stable income and an adequate and clean home for the boys. The boys had lived there, with Moore, for two years prior to Moore’s death. Additionally, it was undisputed that Lucas often left the boys in the Hendrixes’ care on weekends and frequently during the summer; however, Jeannie testified that since initiating the suit, she was only permitted to see them one time. The chancellor described Lucas’s unstable job history and difficulty in paying monthly bills to the extent that the electricity had been cut off for short periods of time. She also discussed both Heather and Lucas’s legal problems, including DUIs, possession of drugs, and altercations. The chancellor noted that Jeannie testified she had taken food to the boys at least eleven times over a one month period. The chancellor did acknowledge the conflicting testimony regarding the condition of the Lucases’ home in regard to cleanliness. Further, the chancellor stated that in spite of being aware of his children’s poor academic performance, Lucas has failed to contact the school or teachers about the problem. The chancellor recounted Tyler’s testimony at trial and “was very much impressed with the credibility of Tyler’s testimony” regarding: an injury he sustained by one of the pit bulls in the home; Lucas’s and Heather’s arguments and the effect of the arguments on his school work; and witnessing Lucas and Heather selling pills in their home. She further described the testimony of several witnesses that Lucas drinks alcohol too much, although Lucas *705 denied having an alcohol problem. Further, the chancellor expressed concern over Lucas’s allegedly drinking and driving with the boys in the car on several occasions and the accessibility of both alcohol and cigarettes to the boys. Lastly, she cites an instance when the boys had walked approximately two miles and called Jeannie from a convenience-store phone because they were home alone and frightened. In her analysis, the chancellor relayed the following reasons for her finding Lucas as an unfit parent: an alcohol problem that goes unaddressed; multiple DUIs; inability to hold a job for a significant period of time; driving with the children in the car while being intoxicated; allowing Tyler and Cody to partake in illegal activities such as drinking and smoking; the lack of supervision in the parental home; the lack of food; the unsanitary and overcrowded conditions of the parental home; and Tyler’s and Cody’s underperformance in school and the lack of parental interest in their academic performance. Based on these facts, the chancellor granted custody to the Hendrixes and granted Lucas Farese-style visitation.[1]
¶ 14. It is from this order that Lucas now appeals raising the following issues:
I. The [chancery] court failed to employ the Albright factors.
II. The [chancery] court improperly weighed the actions of another person (Heather) against the natural parent.
III. The Hendrixes did not prove by clear and convincing evidence that [Lucas] was an unfit parent.
IV. The [chancellor’s] order must be reversed because the Legislature has not defined the process for termination of parental rights.
STANDARD OF REVIEW
¶ 15. On appeal, questions of law receive a de novo review. In re Custody of M.A.G., 859 So.2d 1001, 1003 (¶4) (Miss.2003) (citing Mason v. State, 781 So.2d 99, 100 (¶ 9) (Miss.2000)). However, “[w]here a chancellor has applied the correct legal standard and makes a finding of facts which is supported by substantial evidence, this Court will not reverse her decision.” Id. (citing Touchstone v. Touchstone, 682 So.2d 374, 377 (Miss.1996)).
ANALYSIS
I. Custody
¶ 16. In his first issue, Lucas asserts that the chancellor used an incorrect legal standard by failing to apply an Albright analysis before granting the Hendrixes custody of Tyler and Cody. He next alleges that the chancellor erred in weighing Heather’s conduct against in him when determining him to be unfit for custody. Lastly, Lucas argues the evidence was insufficient to find by clear and convincing evidence that he was an unfit parent. For the sake of judicial economy, we will address these three issues together.
¶ 17. In Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), the Mississippi Supreme Court outlined multiple factors to be considered when determining which natural parent should receive custody of the child, with the polestar consideration being the best interest of the child. The supreme court and this Court have repeatedly stated that a different analysis must be applied when adjudicating custody between a natural parent and a third party, such as in this case. In custody cases involving a natural parent and a third party, a presumption exists that the natural *706 parent is the best custodian for his child. McKee v. Flynt, 680 So.2d 44, 47 (Miss.1993). However, this natural-parent presumption may be overcome by clear and convincing evidence “that the parent has (1) abandoned the child[;] or (2) the conduct of the parent is so immoral as to be detrimental to the child[;] or (3) the parent is unfit mentally or otherwise to have the custody of his or her child.” Id. (quoting White v. Thompson, 569 So.2d 1181, 1183-84 (Miss.1990)); see also McCraw v. Buchanan, 10 So.3d 979, 984 (¶ 15) (Miss.Ct.App.2009). Additionally, pursuant to Mississippi Code Annotated section 93-5-24(l)(e) (Rev.2004):
Upon a finding by the [chancery] court that both parents of the child have abandoned or deserted such child or that both such parents are mentally, morally or otherwise unfit to rear and train the child[,] the [chancery] court may award physical and legal custody to:
(i) The person in whose home the child has been living in a wholesome and stable environment; or
(ii) ... any other person deemed by the [chancery] court to be suitable and able to provide adequate and proper care and guidance for the child.
In the current case, the chancellor relied on this statute because Moore, the boys’ natural mother, was deceased; therefore, Lucas was the sole remaining natural parent. If a chancellor finds the remaining natural parent to be unfit, as she did in this case, then the statute gives the chancellor the authority to grant custody to a third party.
¶ 18. We do not read Mississippi Code Annotated section 93-5-24 or the majority of prior case law to require an Albright analysis if the chancellor finds the sole, natural parent has abandoned or deserted the child or is unfit to raise the child. While in the In Re Dissolution of Marriage of Leverock and Hamby, 23 So.3d 424 (Miss.2009), decision, the supreme court seemingly held that an Albright analysis is required in custody cases between a natural parent and a third party, we are compelled to distinguish the facts of Lever-ock from the facts of the current case. Leverock involved a custody dispute between the minor child’s natural father, Tony Leverock and the deceased natural mother’s foster parents, Brent and Kim Pendleton. Id. at 425 (¶ 1). Leverock and Deanna Hamby, the Pendletons’ foster daughter and the minor child’s mother, were married in 2002 but separated in 2004. Id. at 426 (¶ 3). Upon the couple’s separation, Hamby and the minor child lived with the Pendletons. Id. at (¶ 4) Although Hamby lived with the Pendletons sporadically, the minor child lived with the Pendletons exclusively from approximately 2004 to 2007. Id. at (¶4). The divorce papers Hamby delivered to Leverock in 2006 provided Hamby would maintain physical and legal custody of the minor child. Id. at (¶ 6). The divorce was never granted. Id. at (¶ 6). Ultimately, the chancery court granted custody of the minor child to Leverock after the Pendeltons filed a complaint seeking termination of Leverock’s parental rights and custody of the minor child. Id. at 425 (¶ 1). There was a plethora of evidence presented at trial that Leverock had abandoned the minor child through his failure provide any meaningful support through time or money after the couple separated in 2004. Id. at 426-27 (¶¶ 6-12), 430-31 (¶22). The supreme court reversed and remanded the case, determining that the chancellor erred in finding Leverock had not deserted and abandoned the minor child. Id. at 430-31 (¶ 22), 434 (¶ 34). The supreme court stated:
In a custody case involving a natural parent and third party, the court must *707 first determine whether through abandonment, desertion, or other acts demonstrating unfitness to raise a child, as shown by clear and convincing evidence, the natural parent has relinquished his right to claim the benefit of the natural-parent presumption. If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the Albright factors.
Id. at 431 (¶ 24) (footnote omitted). Unlike in the current case where the chancellor found Lucas to be unfit, the chancellor in Leverock did not make a finding of abandonment or unfitness; therefore, an Albright analysis on remand was necessary to determine whether the Pendletons or Leverock should be granted custody based on the best interest of the minor child. The chancellor in the current case determined that Lucas was unfit and that it would be in the best interests of Tyler and Cody to be in the custody of the Hendrixes; therefore, no further inquiry was necessary.
¶ 19. Next, Lucas argues that the chancellor erred in finding by clear and convincing evidence that he was an unfit parent. In her written opinion, the chancellor provided thorough findings of facts in regard to her determination that Lucas was an unfit parent. As was described above, she had concerns with Lucas’s alcohol abuse; the condition of Lucas’s home; his inability to maintain steady employment; and the lack of supervision the boys received in their hygiene, school work, and other activities. She also expressed her concern with Lucas’s legal issues, including multiple DUIs and other alleged incidents involving physical altercations outside of the home.
¶ 20. Lastly, Lucas asserts the chancellor erred in considering Heather’s alleged drug possession and public intoxication when determining his fitness as a father; however, we do not find that the chancellor relied so heavily on Heather’s actions as to warrant reversal. It is clear the chancellor acknowledged Heather’s conduct, but the chancellor’s opinion spoke primarily of Lucas’s legal and substance troubles as a basis for a finding of unfitness. Based upon our review of the record and our limited standard of review for factual findings of chancellors, we find there is substantial evidence to support the chancellor’s finding by clear and convincing evidence that Lucas was unfit and that it would be in the best interests of Tyler and Cody for the Hendrixes to have primary custody, with Lucas having visitation privileges.
¶ 21. This issue is without merit.
II. Termination of parental rights
¶ 22. Lastly, Lucas argues that the Mississippi Legislature has not addressed the process for the termination of parental rights when not in the context of adoption or foster parenting; therefore, the chancellor had no authority to terminate his. It is important to note that the Hendrixes did not seek a termination of Lucas’s parental rights and that the chancellor did not terminate Lucas’s parental rights. Mississippi Code Annotated section 93-5-24 provides the basis for the chancery court to grant custody to a third party upon a finding that the child’s natural parents have abandoned or deserted the child, or that the child’s natural parent is unfit to properly raise him. Applying this statute, the chancellor found Lucas to be unfit and awarded custody to the Hen-drixes. A finding of unfitness did not terminate Lucas’s parental rights; instead, Lucas lost his natural-parent presumption. *708 Because Lucas’s parental rights were not terminated, this issue is without merit.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, MAXWELL AND RUSSELL, JJ„ CONCUR. FAIR, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND ISHEE, J.

. See Hamilton v. Hamilton, 755 So.2d 528, 530 n. 1 (Miss.Ct.App.1999) (explaining history and use of the Farese visitation schedule in Mississippi).