# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01591-COA

JONI WARNER                                                          APPELLANT

v.

LARRY THOMAS                                                         APPELLEE

DATE OF JUDGMENT:                09/22/2017
TRIAL JUDGE:                     HON. JANE R. WEATHERSBY
COURT FROM WHICH APPEALED:       WARREN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          KIMBERLY WALKER NAILOR
ATTORNEY FOR APPELLEE:           JAMES L. PENLEY JR.
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 03/19/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     Joni Warner appeals the chancery court's denial of her petition for modification of a prior child-custody order, the denial of her motion to reconsider, and the denial of her motion for a new trial. Finding no error, we affirm.

## FACTS

¶2.     Joni Warner and Larry Thomas were never married but are the parents of the minor child, L.J.[1] On April 4, 2016, when the child was four and after the parties had ended their relationship, Warner filed a "Complaint for Order of Filiation, Support and Custody" against Thomas. At that time, Warner was living with, and had just had a child by, her fiancé,

---

[1] The initials are used to protect the privacy of the minor.

Tyrone Harris, a pipeline worker in Texas who came home infrequently. Thomas was living with his new girlfriend, and L.J. was in preschool at the time.

¶3. After a hearing on January 17, 2017, the trial court found that prior to ending their relationship and well after L.J. was born, Thomas spent his off-work hours at Warner's house until it was time for him to go home in the evening. They functioned as a family until Warner and Thomas broke up. Both were working during the week and had stability in their jobs. L.J. lived with Warner who would get him up for school and, after school, did homework with him and got him to bed. When Thomas was with the child, they would play football, practice L.J.'s letters, play games, and go to movies. The child had a good and loving relationship with both parents and was in good physical and mental health. Both parents had good support systems in place for the care of the child. After the breakup, the child spent time with Thomas at his mother's home. Thomas claimed he did not want to be "an every other weekend father."[2]

¶4. In its final decree on January 26, 2017, the trial court applied the *Albright*[3] factors and awarded the parties joint legal and physical custody of the child. According to the decree, Thomas was adjudicated as L.J.'s father and the parties would have alternate weeks of

---

[2] Although the transcript of the January 17, 2017 hearing is included in the record, the facts cited here are taken from the Final Decree entered by the trial court. Because there was no appeal, this Court cannot consider the transcript of the January 17, 2017 hearing because the facts found by the trial court are final and binding and contained no findings of family physical violence.

[3] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

physical custody of the child. Neither party appealed that decision.

¶5. Less than three months later, on April 18, 2017, Warner filed a Petition for Modification claiming a material change in circumstances that adversely affected the best interest of the child. The material change alleged was an April 2, 2017 incident that occurred after one of the minor child's basketball games. Warner claimed that Thomas attempted to assault her and ended up assaulting the minor child. She further pleaded that the municipal court of Vicksburg entered an "Ex Parte Emergency Domestic Abuse Protective Order" following this incident and later entered a Temporary Domestic Abuse Protection Order that prohibited Thomas from contacting Warner until June 14, 2017. Warner also pleaded that modification was necessary because L.J. feared his father. She asked that she be given sole physical and legal custody of the child. Thomas answered, denying these allegations.

¶6. At the hearing on the Petition for Modification, held on August 13, 2017, Thomas and Warner testified, as did each of their mothers and Tyrone Harris (Warner's fiancé). Warner testified and gave her version of the basketball incident which occurred on April 2, 2017, at the YMCA. According to her, the game was over and she had taken L.J. to the concession stand for a hot dog. She also had her baby by Tyrone with her. Thomas came over and talked to the child, telling him that it was a good game, etc. He then looked at her and said "I can't believe you got this ugly ass baby with you. You a dumb mother******." Knowing that things were turning for the worse, she tried to grab L.J.'s hand to leave; Thomas, however, took the child with him "behind what's a board," she said, "[H]e took L.J. behind the board." She then called her fiancé, Tyrone, to tell him that Thomas would not give her

3

the child. Thomas hit the phone out of her hand. She kept trying to get the child back, and finally Thomas grabbed her hand and tried to hit her. He missed and slapped L.J. accidentally instead. L.J. began crying, and she went to find a coach. She then got L.J. back, and as they were leaving, Thomas tried to trip her.

¶7. Thomas, however, gave a different version of events. According to him, after the game, he saw Warner and L.J. and said he wanted to talk to L.J. because he had not been able to see him. L.J. was sitting down, eating his hot dog, and Thomas told him to come over to him. L.J. had no problem coming to him. Warner broke into their conversation and said they were leaving. Thomas grabbed L.J. and said he was not done talking to the child. Warner said that was too bad, snatched the child, and left. He denied attempting to strike Warner and denied hitting the child at all.

¶8. Tyrone Harris testified that he was at work when he received a call from Warner. She was crying and telling him that Thomas had taken L.J. from her and would not give him back. He heard Thomas on the phone say, "[B]itch, you'll get him back when I want you to have him back." And then the call ended.

¶9. Elizabeth Thomas, Thomas's mother, testified that she was at the YMCA that day but she did not witness the incident. Someone told her that she needed to go see about Warner and Thomas because they were arguing. By the time she got to the area, everything was over, and she only saw Warner and L.J. walking out. The child appeared to be fine with one hand holding his mother's hand and the other holding a hot dog. The child was not crying. She asked Warner what had happened, and all Warner would say was that Thomas had lost his

4

mind and that she was going to press charges. Then they left.

¶10. No impartial witness to the event testified.

¶11. Warner did go to the municipal court in Vicksburg on April 7, 2017, and filed a "Petition for Domestic Abuse Protection Order." An ex parte emergency order was entered that same day that prohibited Thomas from going within 100 yards of Warner except for the exchange of visitation. At a hearing held on April 14, 2017, the emergency order was extended through June 14, 2017. However, Thomas was not ordered to undergo any counseling or attend anger management classes.

¶12. Testimony concerning the effect of this incident on the child was clearly partisan. Warner, her mother, and Tyrone said that since the incident, the child cries when he has to go with Thomas; however, Thomas and his mother testified that when they pick him up, the child is happy and fine. Warner and her mother testified that the child now throws tantrums and "acts out," throwing stuff. He is getting into trouble and is not happy. Warner testified that during one week when Thomas had L.J., the child got in trouble at school for saying the word "booty" and hitting people on the booty. However, the court asked Thomas if he had observed the child getting into more trouble and acting out, Thomas replied that he had not and Thomas's mother had not seen the child with a bad attitude. Again, no impartial witness, such as a teacher or counselor, testified about any change in the child's behavior.

¶13. The parties both testified that before the basketball-game incident, there were vulgar and derogatory texts exchanged between them, apparently mostly by Thomas. Thomas claimed these texts resulted from L.J.'s telling him that the fiancé, Tyrone, had whipped him

5

and Warner had refused to confront Tyrone about it. Thomas said he learned this information when he jokingly raised a belt as if to discipline L.J., and L.J. cowered fearfully. Warner denied any such beating by Tyrone and said that L.J. had told her that Thomas told him to lie and say that Tyrone beat him.

¶14. On September 20, 2017, the trial court issued its "Order Denying Modification," reciting a number of the facts above. The trial court pointed out that there were no impartial witnesses to the basketball game incident and found no material change in circumstances adversely affecting the child. It did find, though, that the parties were not working together for the good of the child, warned that they needed to be civil to each other, and indicated that future failure to do so would result in court-ordered parenting classes.

¶15. On September 25, 2017, Warner filed a motion to reconsider and a motion for a new trial. In the motion to reconsider, Warner argued that Mississippi Code Annotated section 93-5-24(9)(a)(i) (Rev. 2013) creates a rebuttable presumption that it is not in the best interest of the child to be placed in joint custody with a parent who has a history of perpetrating family violence. She cited facts from the January 26, 2017 decree and other facts from the January hearing to support that claim and asked for findings of fact and conclusions of law pursuant to this statute. In the motion for a new trial, Warner said that she had located a witness who could provide testimony about the basketball game incident. She further claimed that Thomas was continuing to berate her. She asked for new findings of fact and conclusions of law to direct the parties how to be civil toward each other.

¶16. On October 6, 2017, the trial court denied the motion to reconsider, giving Warner the

findings she asked for under section 93-5-24(9). The trial court acknowledged the domestic-abuse protective orders attached to the motion for modification as well as testimony that disputed whether the child was hurt or even slapped at the basketball game. The court found that there was no serious injury or showed a pattern of family violence, so there was no presumption raised against Thomas. With respect to the texts between them, no one testified that they were read to the child. The trial court also denied the motion for a new trial, stating that Warner had ample time before the hearing to have subpoenaed or presented other witnesses to the incident. The court reiterated that it found no history of perpetuating family violence, and the rebuttable presumption concerning joint custody with Thomas was not triggered. From these orders, Warner appeals.

**STANDARD OF REVIEW**

¶17. When reviewing a chancellor's award of child custody, this Court will only reverse a chancellor's judgment where the chancellor is manifestly wrong or applied an erroneous legal standard. *J.P. v. S.V.B.*, 987 So. 2d 975, 978-79 (¶7) (Miss. 2008). Furthermore, "[w]e will not reverse the chancellor's factual findings where there is substantial evidence in the record supporting [them]." *Id*. (internal quotation marks omitted); *Lucas v. Hendrix*, 92 So. 3d 699, 705 (¶15) (Miss. Ct. App. 2012). We recognize that "it is the responsibility of this Court, like the chancellor, to make the best interest of the child our polestar consideration." *Id*. (citing *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶8) (Miss. 2002)); *Darby v. Combs*, 229 So. 3d 136, 139 (¶11) (Miss. Ct. App. 2016), *aff'd* 229 So. 3d 108 (Miss. 2017). The appellate court reviews a trial court's denial of a motion for a new trial for abuse of

7

discretion. *Miller v. Smith*, 229 So. 3d 148, 154 (¶27) (Miss. Ct. App. 2016); *McLaughlin v. N. Drew Freight Inc.*, 249 So. 3d 1081, 1084 (¶8) (Miss. Ct. App. 2018).  On appeal, we review questions of law de novo. *Lucas*, 92 So. 3d at 705 (¶15).

## DISCUSSION

### I.   DID THE TRIAL COURT ERR IN DENYING THE PETITION FOR MODIFICATION?

¶18.   "Any order for joint custody may be modified or terminated upon the petition of both parents or upon the petition of one . . . parent showing that a material change in circumstances has occurred." Miss. Code Ann. § 93-5-24(6) (Rev. 2013); *Martin v. Stevenson*, 139 So. 3d 740, 748 (¶26) (Miss. Ct. App. 2014).   The parent seeking modification bears the burden of proving: "(1) that a material change of circumstances had occurred since the most recent custody decree, (2) that the change adversely affected the child, and (3) that modification was in the best interest of the child."  *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008). The material change in circumstances must have occurred since the prior custody award.  *Todd v. Todd*, 216 So. 3d 1178, 1182 (¶9) (Miss. Ct. App. 2017).  The party seeking the modification bears the burden of proof by a preponderance of the evidence.  *Martin*, 139 So. 3d at 748 (¶26).

¶19.   When considering a modification of child custody, the proper approach is first to identify the specific change in circumstances, and if that exists, then analyze and apply the *Albright* factors in light of that change. *Weathers v. Guin*, 151 So. 3d 272, 276 (¶17) (Miss. Ct. App. 2014); *Marter v. Marter*, 914 So. 2d 743, 746 (¶5) (Miss. 2005) (quoting *Sturgis*

*v. Sturgis*, 792 So. 2d 1020, 1025 (¶19) (Miss. Ct. App. 2001)). In determining whether a material change of circumstances has occurred, a chancellor should look at "the overall circumstances in which a child lives." *McDonald v. McDonald*, 39 So. 3d 868, 880 (¶37) (Miss. 2010).

¶20. Warner argues that the parties' inability to get along coupled with her obtaining a protective order over the basketball incident was the material change in circumstances that was detrimental to L.J.'s best interests. She cites as support *Tidmore v. Tidmore*, 114 So. 3d 753 (Miss. Ct. App. 2013). In that case, the parties had joint custody of their four-year old twins after their irreconcilable difference divorce in 2008. In 2010, the father filed a petition for modification, among other things, and sought sole custody of the twins. Both parties requested the appointment of a guardian ad litem (GAL) to investigate allegations of abuse. The GAL found that the parties rarely agreed on anything, from the length of the girls' hair to their education and health. Having the benefit of an impartial witness in the GAL, the court found that the parents' lack of communication and cooperation had become detrimental to the children's best interest. *Id.* at 756-57 (¶¶2-7).

¶21. The facts of this case differ from *Tidmore.* There, the disagreements between the parties continued over two years and specifically related to their children. Here the petition to modify was filed three months after the custody order and the disagreements between parties appeared to be personal, and not related to issues dealing with L.J. Neither of the parties requested a GAL to investigate Warner's allegation that the child was struck and the trial court apparently did not consider it necessary to appoint one, given the allegations.

9

Moreover, it appears that this was the only incident where the parents disagreed in the presence of the child at all. The parties' versions of the basketball incident and its effect on L.J. were completely opposite each other. The chancellor, "as the trier of fact, possesses the ultimate discretion to weigh the evidence the way he sees fit." *Martin*, 139 So. 3d at 748 (¶26) (internal quotation mark omitted); *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). "[T]he chancellor is in the best position to make this determination because it is his role to ascertain whether witnesses and evidence are credible and the weight to give to each." *Johnson*, 859 So. 2d at 1014 (¶37) (citation and internal quotation marks omitted). Here the trial court determined from the witnesses and evidence presented that there had been no material change in circumstances that adversely affected the child and we see no manifest error or abuse of the trial court's discretion in doing so. Because no material change in circumstances was found, there was no need for the trial court to undertake an *Albright* factor analysis.

> **II.     DID THE TRIAL COURT ERR IN FINDING THAT THOMAS DID NOT HAVE A HISTORY OF PERPETUATING FAMILY VIOLENCE UNDER MISSISSIPPI CODE ANNOTATED SECTION 93-5-24?**

¶22.    Mississippi Code Annotated section 93-5-24(9)(a) states:

> (i)     In every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence.
>
> . . . .
>
> (iv)    The court shall make written findings to document how and why the

10

presumption was or was not rebutted.

The statute defines a "history of perpetuating family violence" as either one incident of family violence that has resulted in serious bodily injury, or a pattern of family violence against a member of the household. The statute is also clear that the trial court must first make a finding that the parent in question has a history of perpetuating violence before the presumption arises. *Braddy v. Jenkins*, 126 So. 3d 963, 965 (¶13) (Miss. Ct. App. 2013).

¶23. In her motion for reconsideration, Warner argued that trial court had failed to make specific findings pursuant to the statute and raised the basketball game incident, the subsequent protective orders as well as testimony from the January 2017 hearing as evidence that Thomas had a history of family violence.

¶24. Warner's attorney cited *Martin v. Stevenson* as precedent for allowing the trial court to consider of testimony given at the first hearing in January 2017 as well as the testimony at the August hearing. But that is not what we held in *Martin*. In that case, this Court quoted *Lackey v. Fuller*, 755 So. 2d 1083, 1085 (¶¶6-7) (Miss. 2000), where the trial court had allowed testimony of pre-divorce domestic-violence conduct in a modification proceeding. *Martin*, 139 So. 3d at 750 (¶32). The Mississippi Supreme Court has stated:

> We begin with the principles of res judicata[,] which command that a final judgment preclude[s] thereafter all claims that were or reasonably may have been brought in the original action. The familiar rule that a judgment for alimony, custody[,] or support may be modified only upon a showing of a *post-judgment material change of circumstances* is a recognition of the force of res judicata in divorce actions.

11

*Id.* (quoting *Lackey*, 755 So. 2d at 1086 (¶13)).

¶25.    In *Martin,* we held that unless a party can tie some current conduct to past conduct, pre-divorce conduct would not be allowed.  *Id.*  In this case, the only continuing conduct since the initial hearing was the parties' inability to get along between themselves.  In its initial "Final Decree," the trial court made no finding that any conduct constituted family violence and thus no conduct amounting to a continuation of domestic violence could have been found by the trial court thereafter.

¶26.    Like the case of *Brumfield v. Brumfield*, 49 So. 3d 138 (Miss. Ct. App. 2010), here there was only one incident which, even according to Warner, resulted in no serious injury. In *Brumfield*, the husband had allegedly dragged the wife outside, threw her to the ground and hit her twice with a belt.  We found no abuse of the trial court's discretion when it found that the single incident did not result in "serious bodily injury" as required by the statute to conclude that the husband had a history of perpetrating domestic violence.   In that case the wife also entered a subsequent sentencing order allegedly finding the husband guilty of stalking and telephone harassment.  Given the tentative nature of the testimony behind the sentencing order, the trial court found that it did not establish a second incident of domestic abuse. *Id.* at 140-143 (¶¶2-8, 15).  In the case at hand, the Domestic Abuse Protective Orders Warner entered did not relate to anything but the post-basketball game incident, the facts of which the trial court found to be in dispute.  We find no abuse of discretion by the trial court in concluding that the proof did not constitute a history of family violence.

12

### III. DID THE TRIAL COURT ERR IN DENYING THE MOTION FOR RECONSIDERATION AND/OR MOTION FOR NEW TRIAL?

#### A. Motion for Reconsideration

¶27. After the trial court denied the petition for modification, Warner filed a motion for reconsideration, making substantially the same arguments she made in her Petition but adding that the evidence merited a finding under section 93-5-24(9) that Thomas had a "history of perpetuating family violence" and should not enjoy joint custody. Under the Rules of Civil Procedure, the motion for reconsideration technically no longer exists. *See Maness v. K&A Enters. of Miss. LLC*, 250 So. 3d 402, 419 (¶68) (Miss. 2018) (Maxwell, J., specially concurring and joined by four other justices). Warner's motion to reconsider could be construed as a Rule 60(b)(3) motion because Warner claimed in her motion for a new trial under Rule 59 that she had located a witness who could provide testimony about the basketball incident. However, under Rule 60(b)(3), it must also be alleged and shown that the newly discovered evidence could not have been discovered by due diligence. "[N]ew evidence is 'evidence in existence of which a party was excusably ignorant, discovered after trial.'" *Dean v. Slade*, 164 So. 3d 468, 473 (¶14) (Miss. Ct. App. 2014) (quoting *Page v. Siemens Energy & Automation Inc.*, 728 So. 2d 1075, 1079 (¶12) (Miss. 1998)). Warner's motion was silent about the identity of the witness and the content of that witness's testimony. More importantly, the motion is silent about why Warner could not have found the witness earlier. She acknowledges in her brief that she only sought an impartial witness to the basketball incident after the trial court had ruled that no such witness had testified.

13

Warner should have anticipated the need for such a witness and only acted when the trial court noted her lack of evidence. Without a showing that the new evidence was substantive and a good reason why Warner was ignorant of it prior to the August hearing, the trial court properly denied Warner's post-trial motions under Rule 60(b)(3).

B.     Motion for New Trial

¶28.    With respect to the trial court's ruling under Rule 59, we have stated that the chancery court's authority to modify the final judgment is "limited" by Rule 59, and it is a "higher" standard than under Rule 54(b), which allows a trial court to set aside interlocutory decisions for any reason it sees just. *Dissolution of Pevey v. Pevey*, 2017-CA-01144-COA, 2018 WL 4089685, at *1 (¶5) (Miss. Ct. App. Aug. 28, 2018); *Maness*, 250 So. 3d at 419 (¶¶69, 71). A party may only obtain relief on a motion for new trial upon showing: (1) an intervening change in controlling law, (2) availability of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent manifest injustice. *Miller v. Smith*, 229 So. 3d 148, 154-55 (¶28) (Miss. Ct. App. 2016). To grant the motion under Rule 59, the chancery court need only be "convinced that a mistake of law or fact has been made, or that injustice would attend allowing the judgment to stand." *See Pevey*, 2018 WL 4089685, at *2 (¶6); *Maness*, 250 So. 3d at 419 (¶69).

¶29.    The appellate court reviews a trial court's denial of a motion for a new trial for abuse of discretion. *Miller,* 229 So. 3d at 154 (¶27); *McLaughlin.*, 249 So. 3d at 1084 (¶8). In the "Order Denying the Motion for Reconsideration" the trial court made specific factual findings on the proof Warner provided to show that Thomas did not have a "history of

perpetrating family violence." It found that the "Domestic Abuse and Protective Orders" and Warner's testimony about Thomas's slapping the child was countered by Thomas and his mother's testimony. It found that there was no serious injury caused and this single incident did not constitute a "history of perpetrating violence" to trigger a presumption against continuing joint custody between the parties. We find that the trial court applied the proper legal analysis in determining that there was no basis for a new trial, and thus it did not abuse its discretion. *See Lee v. Lee*, 154 So. 3d 904, 909 (¶¶25-26) (Miss. Ct. App. 2014).

## CONCLUSION

¶30.    We find that the trial court's denials of the Petition for Modification, the motion for for reconsideration and the motion for a new trial were not manifestly wrong or clearly erroneous, and further we find that the trial court applied the proper legal standard and did not abuse its discretion. Accordingly, the trial court's judgment is hereby affirmed.

¶31.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

15