IRVING, J.,
for the court.
¶ 1. Paula Clay filed a petition for divorce and temporary relief against her spouse, Stephen Clay. Both parties consented to the divorce on grounds of irreconcilable differences and agreed to allow the chancellor to equitably distribute liabilities and assets, as well as decide child custody and support. The chancellor divided the marital property and awarded physical and legal custody of the parties’ minor child to Stephen. Feeling aggrieved by the verdict, Paula has appealed and asserts that the trial court applied the Albright factors in a clearly erroneous manner and erred by awarding custody of the minor child to Stephen.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. Stephen Clay and Paula Clay were married in May of 1996. This union was Stephen’s third marriage and Paula’s fourth. Stephen is twenty-six years older than Paula. From this marriage, one son, Brady, was born. The child was born while Stephen was still married to another woman from whom he had been separated for nearly two years. Paula has one daughter, Stephanie, from a previous marriage.
¶ 4. Stephen was first married at age seventeen. That marriage lasted twenty-eight years and produced four children. Paula was also first married at age seventeen. That marriage lasted for eight months. She then married Mark McCul-ley in 1989, and that marriage produced Stephanie. She divorced McCulley on May 7, 1993, and married her third husband, Eddie Mayo, on May 27, 1993. Mayo committed suicide in May of 1995. At the time of Mayo’s death, Paula met Stephen. During this time, Stephen was a coroner at the funeral home that conducted Mayo’s funeral.
¶ 5. In June of 1995, the two started a sexual relationship, and Paula became pregnant. Before her marriage to Ste *217 phen and while she was pregnant, Paula moved in with Stephen. They married and lived together until their separation in May of 2000.
¶ 6. During the period they were together, Stephen changed jobs nine times. At the same time, Paula worked in the store the couple owned for about a year and worked as a welder for about a year just before the separation.
ANALYSIS AND DISCUSSION OF THE ISSUES

Standard of Review

¶ 7. The standard of review in child custody cases is rather limited. We reverse only if a chancellor is manifestly in error or has applied an erroneous legal standard. Lee v. Lee, 798 So.2d 1284, 1288(¶ 14) (Miss.2001) (citing Williams v. Williams, 656 So.2d 325, 330 (Miss.1995)). The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each. Id. (citing Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss.1994)). In custody matters, we, as an appellate court, shall not disturb the decisions of chancellors unless it is clear that justice and the law require us to do so. Id.
I. WHETHER THE TRIAL COURT ERRED IN ITS APPLICATION AND ANALYSIS OF THE AL-BRIGHT FACTORS
¶ 8. In child custody cases, the polestar consideration is the best interest of the child, and this must always be kept paramount. Lee, 798 So.2d at 1288(¶ 15) (citing Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994)). To help guide us to a proper determination as to custody, the court considers the following factors in determining the child’s best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship. Id. (citing Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983)).
¶ 9. While the Albright factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Id. Determining custody of a child is not an exact science. Id.
¶ 10. In the case before us, the chancellor made on-the-record findings for each Albright factor and obviously weighed the concerns of both parties. However, Paula contends the chancellor manifestly erred by making certain findings not supported by substantial evidence. She also argues that the chancellor failed to make findings in her favor which were supported by the evidence. Therefore, it is appropriate that we briefly revisit the chancellor’s analysis of each Albright factor to see if he committed manifest error.

(1) Physical, Mental Health, and Age of the Parents

¶ 11. In considering this factor, the chancellor observed that the age of the parents was very significant because the child was only five years old. He noted that the mother was only thirty-three while the father was fifty-nine. Therefore, *218 the chancellor determined that the age factor favored the mother. The chancellor observed that it was questionable whether the father would remain physically able to raise the child the next sixteen years.
¶ 12. As to the physical and mental health of the parties, the chancellor found that Stephen had polyps, which were not malignant, removed from his colon and high blood pressure which is now under control. On the other hand, Paula suffered from back problems that often restricted her activity. Two witnesses gave testimony concerning their observation of Paula’s physical condition. They testified that on numerous occasions Paula appeared tired and suffered from headaches which caused her to have to lie down or take something to help remedy her condition. Photos were admitted into evidence which showed she has been overweight in the past, while at trial, she appeared significantly underweight. Some witnesses suggested she had bulimia. Paula denied this claim. Paula testified she regularly took Herbolite, drank herbal tea, and greatly restricted her diet. There was testimony that her cooking was limited, and she regularly proclaimed she did not cook. The chancellor expressed concern about placing the child with Paula if she was obsessed with dieting. The chancellor found that Paula would probably not provide the child with a proper diet and concluded that the mental health factor favored Stephen.

(2) Stability of the Home Environment

¶ 13. The chancellor found that Stephen had not made wise employment choices in that he had changed jobs with great frequency since 1996. Although Stephen claimed Paula persuaded him to make some of these changes, the chancellor noted that Stephen was twenty-six years older than Paula. Therefore, Stephen must be held responsible for his employment decisions. Obviously, the chancellor commented, these decisions were not very wise because, as a result, Stephen had lost his home. The chancellor concluded that this factor favored Paula.

(S) Age, Health and Sex of the Child

¶ 14. The chancellor found that the age of the child favored the mother, but that the sex of the child favored the father.

(4) Employment and Responsibilities of Parent

¶ 15. The chancellor proclaimed neither party had an advantage in employment because both parties had jobs which permitted them time to care for the child.

(5) Continuity of Care

¶ 16. The chancellor found that the mother had been the principal caregiver during most of the child’s life. The mother did not work from September 1996, until she started her job in 1999, except to work in the store the spouses operated together for about one year. The chancellor concluded Paula prevailed on this factor.

(6) Willingness and Capacity to Provide Primary Care

¶ 17. The chancellor did not make a finding as to which parent this factor favored. He noted that both parties professed to be willing to care for the child. However, he found some evidence that the mother might not be as willing as she represented. He explained there was evidence that (1) in 1996, Paula was not willing to get up with the child at night, (2) she would not wash the sheets after the child wet the bed, (3) in .August of 1996, she would regularly leave the child with Stephen’s daughters so she would not have to take care of him, and (4) in 1997, when *219 Stephen and Paula worked in the store together, Stephen was the primary caregiver for the child. While the chancellor did not make an express finding as to this factor, it is clear to us from what he did say that he weighed this factor in Stephen’s favor.

(7) Parenting Skills

¶ 18. The chancellor acknowledged the difficulty of deciding the parenting skills factor. He consequently made no ruling as to which party prevailed. He found that Paula had taught Stephanie, her other child, a great deal about sex at an early age. The child’s tendency to be outspoken on the matter of sex caused one of Stephen’s daughters to keep her child away from Stephanie. On the other hand, the chancellor acknowledged that Stephen’s three grown daughters seem to have turned out really well but found it questionable as to whether Stephen could be given credit for their success. While they were growing up, Stephen worked multiple jobs. He had a difficult relationship with his youngest daughter when she was twelve following his divorce from her mother. His other daughter testified that he was more loving to Brady than he was to his daughters.
¶ 19. The chancellor finally acknowledged testimony about Brady, at age four, threatening to kill his mother and his half-sister. He explained that Brady’s behavior indicates that one of the parents was exposing him to improper guidance, and one or both of the parents lack needed parenting skills.

(8) Emotional ties

¶ 20. From the evidence presented, the chancellor could not ascertain any distinction in the emotional bond between the child and the father and the emotional bond between the child and the mother.

(9) Moral Fitness

¶ 21. The chancellor found little difference between the two parties on the issue of moral fitness. The chancellor found both attended church regularly. He also acknowledged both participated in extramarital sex which brought the child into existence. Their sexual activity occurred within weeks of the death of Paula’s third husband and while Stephen was still married to his second wife from whom he had been separated for some time. Each party blamed the other for the origination of their sexual relationship.
¶ 22. The chancellor observed that Stephen was indicted for a felony in connection with his duties as Winston County Coroner. He resigned and pled guilty to a misdemeanor in connection with these charges. The charges involved a change in a death certificate, and the testimony provided no explanation of why Stephen pled in that manner. While the chancellor may have placed some weight on Stephen’s misdemeanor conviction, we see no relevance of this conviction to the moral fitness of Stephen to serve as the custodial parent of the minor child. Nevertheless, it does not appear that this conviction substantially influenced the chancellor’s decision on this factor because the chancellor, in essence, concluded that the moral fitness factor favored neither party.

(10) Other factors

¶ 23. In considering other factors relevant to the parent-child relationship, the chancellor discussed the apparent lack of good judgment of both parents. Stephen had a sexual relationship with Paula right after her husband died and got her pregnant while he was married to another. He had changed jobs nine times in five years. He got in debt so deep that he had to consolidate his other debts with his home *220 loan, and the payment was so high that he could not make the payment.
¶ 24. Paula, at age thirty-three, had been married four times. She married Mayo just weeks after her divorce from husband number two. She got pregnant by Stephen just weeks after Mayo died. She pushed Stephen to make frequent job changes. She participated in letting the debts get so high that the couple lost their home and van. She apparently squandered the $65,000 life insurance that she received from Mayo’s death.
¶ 25. The chancellor observed that “[t]his evidence indicated that neither had the kind of responsibility needed to make a good parent.” However, in resolving the custody issued on the evidence before him, he recited the following:
After considering these matters, the Court concludes that it is more likely that the father will live long enough to raise the child than it is that the mother will settle with one man and establish a stable home. It also appears likely that with the divorce and with the responsibility for the child, that the father will stick with his job at the church which will clearly facilitate his caring for the child. It also appears that with the mother’s addiction to dieting there is a strong likelihood that the mother would not nourish the child as well as the father. It also appears that the child’s inappropriate behavior must be attributed to the mother. With these facts, the Court concludes that custody should be awarded to the father.
¶ 26. In conclusion, it is the chancellor’s duty to weigh the evidence, and he is in a better position than this Court to judge the veracity of the witnesses and the credibility of the evidence. In reviewing the record, this Court finds that the chancellor was justified in ruling as he did. The chancellor made on-the-record findings as to every Albright factor, and there is no evidence that his decision was manifestly in error or based on an erroneous legal standard. Therefore, we affirm as to this issue.
II. WHETHER PAULA’S REQUEST FOR A NEW TRIAL ON ALL ISSUES SHOULD BE GRANTED WHERE SHE HAS MADE NO ASSIGNMENT OF ERROR CONCERNING THOSE ISSUES
¶ 27. Paula asks for a new trial on all issues. She spends considerable time reciting facts in her brief relating to the court’s equitable division of marital property. However, she fails to address or assign any error to the court’s division of property or any other issue, except that of child custody. Where an assignment of error is not discussed in the briefs, it is considered abandoned and waived on appeal. Summit v. State, 758 So.2d 1091, 1094 (Miss.Ct.App.2000). Accordingly, we conclude that Paula has abandoned all issues other than child custody.
¶ 28. THE JUDGMENT OF THE CHANCERY COURT OF WINSTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J, KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.