MAXWELL, J.,
for the Court:
¶ 1. The ultimate goal in child-custody cases is the best interest of the child. While Mississippi law presumes a child’s best interests are served by living with his natural parents, when a natural parent abandons or deserts the child, the natural-parent presumption goes away. At that point, the chancellor must determine whether it is in the child’s best interest to award custody to the parent or a third party.
¶ 2. Here, the chancellor found that both Jerrica Hamilton and Edward Houston had deserted their son, Jaquavion. With the natural-parent presumption gone, the chancellor found it was in Jaquavion’s best interest for custody to be awarded to his paternal grandparents, who had joined Edward’s custody petition and had provided Jaquavion a home and continual financial support. Because the chancellor applied the proper legal standard and based his factual findings on clear and convincing evidence, we affirm.
Background
¶ 3. This case is a consolidation of two actions, Department of Human Services of the State of Mississippi v. Edward D. Houston (No. B-ll-04-0135) and Edward D. Houston v. Jerrica Quinsha Hamilton (No. B-11-04-0163-ML). In the first, the Department of Human Services (DHS) and Edward Houston petitioned the chancellor to formally establish Edward’s paternity of Jaquavion. Though Jaquavion’s parents never married, Jerrica told Edward that he was the father. Edward also consistently held himself out as Jaquavion’s father, and genetic DNA testing confirmed his paternity to a 99.99% probability. In the second action, Edward sought custody of his son, to change Jaquavion’s surname to Houston,[1] and to obtain child support. *1008 Edward’s parents, Hubert Edward and Sarah Elizabeth Houston (the Houstons), joined Edward in this action.
¶ 4. Trial testimony established that Ja-quavion, who was born August 8, 2006, stayed with his mother until he was around three months old. From ages three months to six months, he lived primarily with the Houstons but would stay with his mother at his maternal grandmother’s house on Wednesdays and Thursday mornings. Around the age of six months, Jaquavion began to live full-time with the Houstons and saw Jerrica only sporadically. In April 2011, when Jaqua-vion was five, Jerrica was arrested for drug possession, and that same month lost custody of her oldest son to his natural father, Jonathan Parker. Sarah Elizabeth testified at a custody hearing on behalf of Parker. Angered, Jerrica took Jaquavion back to live with her and her mother. A month later, in a temporary custody hearing, the chancellor awarded the Houstons temporary custody, pending the outcome of the child-custody dispute.
¶ 5. Despite the fact that both parents were, at least nominally, involved in Jaqua-vion’s life, the trial clearly established the Houstons as Jaquavion’s primary caretakers and financial supporters. According to the chancellor, “certainly this Court finds that the home where the child has remained was with the paternal grandmother, [Sarah Elizabeth].” The chancellor further found that Jerrica and Edward “have deserted, financially and emotionally, this child. And for that reason ... the natural parent presumption [is] overcome by clear and convincing evidence.” The chancellor then conducted an Albright analysis, finding the factors for the continuity of care, parental skills, stability of a home life, and employment all indicated that Jaquavion’s best interests would be served by a life with the Houstons. The chancellor awarded the Houstons custody of Jaquavion and awarded both Jerrica and Edward visitation.
¶ 6. Jerrica appeals.[2]
Standard of Review
¶ 7. The standard of review for a child custody case is a narrow one. We will not reverse unless the chancellor made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard. Mabus v. Mabus, 847 So.2d 815, 818 (¶ 8) (Miss.2003).
¶ 8. With this standard in mind, we note the Houstons did not file a responsive brief. Traditionally, the failure to file a brief was “tantamount to a confession of error.” Gary v. Gary, 84 So.3d 836, 838-39 (¶ 11) (Miss.Ct.App.2012). But “when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, [we] will ‘reach the merits of the issues in [the] appeal, though we proceed unaided by a brief from the appellee.’ ” N.E. v. L.H., 761 So.2d 956, 962 (1114) (Miss.Ct.App.2000) (quoting Allred v. Allred, 735 So.2d 1064 (¶ 9) (Miss.Ct.App.1999)). Following the Mississippi Supreme Court, we “make a special effort to review the record for support” for the chancellor’s child-custody determination. Barber v. Barber, 608 So.2d 1338, 1340 (Miss.1992) (citations omitted).
*1009 Discussion

I. Request for Custody

¶ 9. Jerrica first asserts the chancellor could not award the Houstons custody because they had not petitioned for custody. By joining Edward’s petition, Jerrica claims, the Houstons merely joined the request that Edward be awarded custody and were not asserting their own claim as Jaquavioris proper custodians. We disagree.
¶ 10. The Houstons were statutorily authorized to petition for custody. Miss. Code Ann. § 93 — 11—65(l)(a) (Supp.2011); see also Rutland v. Pridgen, 493 So.2d 952, 954-55 (Miss.1986) (holding the chancellor may grant grandmother custody under this statute so long as natural-parent presumption is rebutted). The Houstons were parties to Edward’s custody petition. And while the petition specifically suggested Edward “should be awarded physical and legal custody,” it generally requested the chancellor “make a determination of child custody.” By joining as parties themselves, the Houstons asserted their own interest as Jaquavion’s primary caretakers.
¶ 11. The polestar consideration in every child-custody action is the best interest of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). Having found the Houstons had properly joined the child-custody action, so long as the chancellor found the natural-parent presumption had been rebutted, we find it was proper for the chancellor to consider whether it was in Jacqavion’s best interest for the Houstons, as opposed to Jerrica or Edward, to receive custody.

II. Child Custody Between Natural Parent and Third Party

¶ 12. Jerrica next argues the chancellor could not award custody to the Houstons, third parties, because of the natural-parent presumption.

A. The Natural-Parent Presumption

¶ 13. In a child-custody determination between two natural parents, the chancellor considers the factors under Al-bright to determine which natural parent’s custody would be in the best interest of the child. Lucas v. Hendrix, 92 So.3d 699, 705 (¶ 17) (Miss.Ct.App.2012) (citing Albright, 437 So.2d at 1005). But in a child-custody determination between a natural parent and a third party, such as a grandparent, the law presumes that it is in the best interest of the child for his natural parent to have custody. Id. at 705-06 (¶ 17) (citing McKee v. Flynt, 630 So.2d 44, 47 (Miss.1993)); see Lorenz v. Strait, 987 So.2d 427, 434 (¶ 41) (Miss.2008) (holding that, because “[gjrandparents have no legal right [to] custody of a grandchild, as against a natural parent,” the natural-parent presumption applies in custody cases between grandparents and natural parents).
 ¶ 14. This presumption is “not unassailable.” In re Custody of Brown, 66 So.3d 726, 728 (¶10) (Miss.Ct.App.2011) (citing Vaughn v. Davis, 36 So.3d 1261, 1264 (¶10) (Miss.2010)). “The natural-parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent’s conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.” Smith v. Smith, 97 So.3d 43, 46 (¶ 9) (Miss.2012) (citing Vaughn, 36 So.3d at 1264-65; In re Dissolution of Marriage of Leverock & Hamby, 23 So.3d 424, 429-30 (¶20) (Miss.2009); Carter v. Taylor, 611 So.2d 874, 876 (Miss.1992)). Once the presumption is rebutted, the natural parent is on equal footing with the grandparent, and the chancellor applies Albright to determine whether it is in the best interest of the child for the *1010 parent or the grandparent to have custody. Leverock, 23 So.3d at 431 (¶ 24) (citations omitted).
¶ 15. That is what the chancellor did here. After finding Jerrica and Edward had both deserted Jaquavion, the chancellor applied the Albright factors and determined it was in Jaquavion’s best interest to award the Houstons custody. See Smith, 97 So.3d at 49 (¶ 17) (holding that, because the “chancellor found, and the record supported, desertion,” the “natural-parent presumption ... was properly rebutted, and an Albright analysis was justified on that basis”).

B. Clear Evidence of Desertion

¶ 16. Jerrica does not challenge how the chancellor applied the best-interest test under Albright. Instead, she asserts the chancellor should not have applied the best-interest test because there was not clear evidence she had deserted Jaquavion. Jerrica suggests, without clear evidence of desertion, she is entitled to custody based on the natural-parent presumption.
¶ 17. The Mississippi Supreme Court has defined “desertion” as forsaking a person to whom one is legally obligated or forsaking “one’s duty.” Leverock, 23 So.3d at 430 n. 2 (quoting Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982)). Desertion differs from abandonment in that “abandonment has to do with the relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or obligation.” Id. Recently, the supreme court found a mother’s “long and continuous absences, her failure to exercise her parental rights, and her failure to fulfill her parental responsibilities,” which had caused the child’s grandparents to step in a primary caretakers, were “actions ... consistent with desertion.” Smith, 97 So.3d at 48 (¶ 16). In Smith, the child “had been in [the mother’s] exclusive care and custody for a period totaling no more than twelve weeks since he had been born,” and the mother failed to provide financial support or devote time to the child after relinquishing care. Id.
¶ 18. Here, we find clear and convincing evidence that not only Jerrica but also Edward deserted Jaquavion by avoiding their duty to provide for his needs. The trial testimony clearly showed both parents were absent for extended periods of time. Like the mother in Smith, Jerrica only acted as Jaquavion’s primary caretaker for the first three months of his life. After that, the Houstons were Jaquavion’s primary caretakers. Sarah Elizabeth took Jaquavion to his doctor’s appointments, clothed and fed him, and supported him financially. And while Edward’s listed residence was with his parents, he acknowledged living with various girlfriends more often than at his parents’ home with his son.
1Í19. Both parents admitted they did not provide the financial support required to sustain Jaquavion. While Jerrica occasionally earned money from styling hair, she did not give any of this money to the Houstons for Jaquavion’s expenses. And Jerrica acknowledged that, on the few occasions Jaquavion stayed with Jericca and her mother, Jericca’s mother took care of Jaquavion financially. While Edward would occasionally purchase clothing, school supplies, and food for Jaquavion, his financial support or assistance for Jaqua-vion’s needs was, at best, sporadic.
¶ 20. Based on Jerrica’s and Edward’s long and continuous absences and the forsaking of their parental responsibilities, we find there was clear and convincing evidence that they both had deserted Jaquavion. To the extent Jerrica attacks the credibility of the various witnesses at trial and the sufficiency and weight of the evidence considered by the chancellor, in child custody cases “the chancellor has the sole responsibility to determine the credi *1011 bility of witnesses and evidence, and the weight to be given each.” Clay v. Clay, 837 So.2d 215, 217 (¶ 7) (Miss.Ct.App.2003) (citing Lee v. Lee, 798 So.2d 1284, 1288 (¶ 14) (Miss.2001)).
¶ 21. The chancellor’s finding of desertion negated the natural-parent presumption, making a best-interest analysis under Albright appropriate. See Smith, 97 So.3d at 49 (¶ 17); Leverock, 23 So.3d at 431 (¶ 24). Because Jerrica does not challenge the chancellor’s Albright analysis, we affirm the award of custody to the Houstons.
¶ 22. We also note that since the chancellor found both natural parents had deserted Jaquavion, the chancellor also had statutory authority to award the Houstons custody based on their role as Jaquavion’s primary caretakers. Under Mississippi Code Annotated section 93-5-24(l)(e)(i) (Rev.2004), if a court finds “both of the parents of the child have abandoned or deserted such child[,] ... the court may award physical and legal custody to ... [t]he person in whose home the child has been living in a wholesome and stable environment.]” See Lucas, 92 So.3d at 705-06 (¶¶ 17-18) (holding, when a chancellor finds both parents have deserted the child, custody may be awarded to the person in whose home the child has been living without first addressing the Albright factors).
¶ 23. We affirm.
¶ 24. THE JUDGMENT OF THE PA-NOLA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, RUSSELL AND FAIR, JJ„ CONCUR.

. According to statute, when a chancellor determines paternity, the child’s surname shall be that of the father, "unless the judgment specifies otherwise." Miss.Code Ann. § 93-9-9(1) (Supp.2011).

. The chancellor also ordered the following, which Jerrica does not appeal:
(1) Jaquavion’s surname be legally changed to Houston, .
(2) Jaquavion’s birth certificate be amended to reflect that change,
(3) Edward be legally declared the father, and
(4) Edward provide reasonable child support to the Houstons upon gaining employment.