# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01266-COA

**DEANNA KAYE PATRICK F/K/A DEANNA KAYE RAINES**                    APPELLANT

**v.**

**JAMES DEWEY BOYD AND BRITTANY PAIGE RAINES**                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2014 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | TATE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | BYRON RUSSELL MOBLEY |
| ATTORNEY FOR APPELLEES: | KIRKLAND CALDWELL WILLINGHAM |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| TRIAL COURT DISPOSITION: | GRANTED CHILD CUSTODY TO APPELLEES; GRANTED GRANDPARENT VISITATION TO APPELLANT; TERMINATED CHILD SUPPORT OBLIGATIONS; AND ORDERED CHILD'S NAME CHANGED ON HIS BIRTH CERTIFICATE |
| DISPOSITION: | AFFIRMED - 04/05/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     Brittany Raines and James Boyd had a son, Hayden, when they were only sixteen years old.  In July 2008, when Hayden was less than one year old, James was in the middle of a one-year prison term, and Brittany's life was so unstable that she voluntarily relinquished temporary custody of Hayden to her mother, Deanna Patrick.  Thereafter, Brittany and James remained at least somewhat involved in Hayden's young life, but James's probation was

revoked, which led to another year of incarceration, and Deanna's "temporary" custody of Hayden stretched into a fourth year. In April 2012, James was released from jail, he found steady employment and avoided criminal activity, and he and Brittany eventually moved into a house of their own and had a second child, a daughter. They have also maintained regular visitation with Hayden, and in June 2013 they filed a petition for custody of him. Deanna opposed the petition, believing that it was in Hayden's best interest to remain with her. Following a hearing in July 2014, the chancellor awarded custody to James and Brittany. Deanna appeals, but we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Hayden was born on August 2, 2007. Brittany and James were sixteen years old at the time. James was present in the hospital room when Hayden was born, and he believed that Hayden was his son, although he was not identified as the father on Hayden's birth certificate, and he did not take a DNA test at the time. James testified that he did not submit to a DNA test because he was worried that it might show that he was not Hayden's father.

¶3. James was incarcerated for larceny from approximately April 2008 to April 2009. In July 2008, Brittany voluntarily relinquished temporary custody of Hayden to Deanna. An agreed order was entered granting Deanna temporary legal and physical custody. James was not made a party to the action. Deanna and Brittany both testified that Brittany's lifestyle was "unstable" at the time, so Deanna agreed to take temporary custody of Hayden until Brittany could improve her situation and care for Hayden.

¶4. From Hayden's birth until April 2012, Brittany lived with Deanna off and on.

2

Brittany estimated that she lived with Deanna for approximately two years during that period. When Brittany lived with Deanna, she provided care for Hayden. When Brittany lived elsewhere, she lived nearby and visited Hayden, and Deanna acknowledged that there was never a period of time when Brittany was not involved in Hayden's life. In addition, Hayden visited regularly with James's grandparents, who raised James.

¶5.     James was released on parole in April 2009, but his parole was revoked in April 2011 because he was found in the company of scrap iron thieves. He was incarcerated for another year and released around April 2012. He was then on house arrest for nine months and completed a term of parole.[1]

¶6.     After James was released in April 2012, he and Brittany moved in together. Since April 2012, James appears to have maintained regular employment, primarily in the logging business. He also appears to have avoided criminal activity. In 2013, Brittany and James had a second child, a daughter, and moved into their own three-bedroom house. Although Brittany previously worked at Wal-Mart, she and James testified that James now earns enough for her to stay home with their daughter. Brittany testified that she would "rather be [taking care of their daughter] than be anywhere else," and there was no evidence that she and James were unfit to parent and have custody of their daughter.

¶7.     James testified that he and Brittany regularly spent time with Hayden between April 2012 and June 2013. James testified that, with Deanna's permission, they were with Hayden "all through the week" and "[a]ll through [the] summer." According to James and Brittany,

---

[1] The dates of James's incarceration, parole, and house arrest are based on James's testimony. No records of his incarceration were introduced into evidence.

3

during this period they were trying to demonstrate to Deanna that they were ready and able to care for Hayden, and they repeatedly asked for custody of him. However, Deanna would not agree to them having custody of Hayden unless they met certain "conditions," such as having a stable home and Brittany's completion of her GED. Brittany and James say that they satisfied Deanna's conditions.

¶8.     In June 2013, James and Brittany filed a petition for custody of Hayden. According to James, they did so because he concluded that Deanna was not going to relinquish custody voluntarily. Over the next year, James and Brittany exercised court-ordered temporary visitation, first every other weekend and then three weekends a month.

¶9.     Deanna claimed that James petitioned for custody only to avoid paying child support, an accusation that James denies. It appears that an order was entered in October 2011 establishing James's paternity and requiring him to pay child support for Hayden to the Department of Human Services (DHS). The order was based on a DNA test administered to James while he was incarcerated. As noted above, James remained incarcerated until April 2012. In June 2013, DHS apparently obtained an order requiring James to pay back child support. James testified that he subsequently paid $5,554 in back child support and continued to pay $180 per month.[2]

¶10.    The court held a hearing on the custody petition in July 2014, when Hayden was almost seven years old. There was testimony that Hayden felt anxiety as a result of the custody proceeding, which is understandable, but in general the evidence indicated that he

---

[2] No records from the child support case were made part of the record in this case. The discussion in this paragraph is based on testimony at the hearing.

is a healthy and happy child. A licensed social worker hired by Deanna expressed some concerns about James and Brittany, the most serious of which seems to have been that, at one time, James and Brittany were not giving him his ADHD medication. James admitted that at first he did not give Hayden the drug (Focalin) because he did not think that Hayden needed it. James was concerned that six-year-old Hayden was not himself after taking the drug—as James put it, Hayden wanted to sit on the couch rather than go outside and play. Brittany and James also testified, however, that they now accept that a doctor prescribed the drug, and they require Hayden to take it. According to the social worker's notes, Hayden confirmed this. Deanna did not object to James and Brittany having visitation with Hayden, but she maintained that it was not in Hayden's best interest for them to have custody.

¶11.    At the conclusion of the hearing, the chancellor granted custody of Hayden to James and Brittany. The chancellor emphasized that James had never voluntarily relinquished custody of Hayden, as he was not a party to the 2008 order granting custody to Deanna. The chancellor therefore reasoned that the hearing involved "an initial custody determination as to [James]," meaning that James was entitled to the benefit of the natural parent presumption. The chancellor found that James had not abandoned Hayden because he had remained "involved in [Hayden's] life," and there was no showing that he was an unfit parent. Accordingly, the chancellor concluded that James was entitled to custody of Hayden.

¶12.    The chancellor found that Brittany had voluntarily relinquished custody of Hayden based on the 2008 order granting custody to Deanna. However, the chancellor conducted an *Albright* analysis, *see Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983), and determined

5

that it would be in Hayden's best interest for Brittany to also have custody.

¶13. The court's order modifying custody also directed the Mississippi State Department of Health to change Hayden's surname to "Boyd" on his birth certificate, terminated James's child support obligations, and granted Deanna grandparent visitation of one weekend per month, two weeks during the summer, and one week at Christmas.

## ANALYSIS

¶14. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014).

¶15. On appeal, Deanna contends that the chancellor misapplied the law and manifestly erred by awarding custody to James and Brittany. Deanna also claims, in the alternative, that the chancellor should have granted her more extensive grandparent visitation. Finally, Deanna maintains that the chancellor lacked authority to terminate James's child support obligations or to order changes to Hayden's birth certificate.

¶16. Brittany and James did not file a brief on appeal. "Failure of an appellee to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of [the] appealing party, that there was no error." *Mosley v. Atterberry*, 819 So. 2d 1268, 1272 (¶17) (Miss. 2002) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 458 So. 2d 714, 717 (Miss. 1984)) (alteration

6

omitted). "However, automatic reversal is not required. Moreover, where child custody is at issue, the Court is compelled to review the record, despite a failure to file a brief." *Id.* (citing *Muhammad v. Muhammad*, 622 So. 2d 1239, 1242 (Miss. 1993)).

¶17. Having reviewed the record, we conclude that the judgment should be affirmed despite James's and Brittany's failure to file a brief. Because James's claim for custody must be evaluated under a different legal standard than Brittany's claim, we address James's claim first. We then address Brittany's claim and the remaining issues raised by Deanna on appeal.

### I.     James

¶18. The chancellor appropriately recognized that this is an "initial custody determination" as to James because, unlike Brittany, he never voluntarily relinquished custody of Hayden. Therefore, James is entitled to the benefit of the "natural parent presumption." *See generally Davis v. Vaughn*, 126 So. 3d 33 (Miss. 2013); *Vaughn v. Davis*, 36 So. 3d 1261 (Miss. 2010).

¶19. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Smith*, 97 So. 3d at 46 (¶8). "[T]he natural parent presumption [is] a bedrock principle of Mississippi family law." *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (¶35) (Miss. 2006) (quotation marks omitted). "Giving preference to natural parents, *even against those who have stood in their place*, honors and protects the fundamental right of natural parents to rear their children." *Davis*, 126 So. 3d at 37 (¶13) (emphasis added). As our Supreme Court explained in 1879 and again in 2013,

> Nature gives to parents that right to the custody of their children which the law merely recognizes and enforces. It is scarcely less sacred than the right to life and liberty, and can never be denied save by showing the bad character of the parent, or some exceptional circumstances which render its enforcement

7

inimical to the best interests of the child.

*Id.* at 37-38 (¶13) (quoting *Moore v. Christian*, 56 Miss. 408 (1879)).

¶20.	As relevant in this case, the natural parent presumption may be rebutted only if the *third party* proves "*by clear and convincing evidence*" that the parent abandoned or deserted the child.[3]	*Id.* at 37 (¶10) (emphasis added).	To be clear, the third party bears this heightened burden of proof; it is not the natural parent's burden to prove his or her fitness as a parent.	*See id.* at 38 (¶13).	Whether a parent has abandoned or deserted a child is "a factual question best left to the trial judge."	*Id.* at 39-40 (¶20).	Therefore, we may not reverse the chancellor's finding that James did not abandon or desert Hayden[4] unless we can say that the chancellor failed to apply "the correct legal standard" or that her "findings of fact were . . . manifestly wrong [or] clearly erroneous."	*Id.* at 40 (¶20).

¶21.	As discussed above, there is ample evidence that James regularly spent time with Hayden after his release from the county jail in April 2012 through the July 2014 hearing on

---

[3] Other grounds for rebutting the presumption are not at issue in this appeal.

[4] On appeal, Deanna argues that the chancellor considered *only* "abandonment" and "completely overlook[ed]" or "failed to properly consider" the "distinct" issue of desertion. It is true that the chancellor's ruling from the bench and written opinion referred only to "abandonment," not "desertion."  However, we are also unable to locate anywhere in the record that Deanna specifically raised the issue of "desertion."  The word does not appear in the pleadings or in the transcript.  Deanna's attorney referred *only* to "abandonment" in his argument, and it appears that the chancellor simply adopted his verbiage and responded to the arguments that he actually made.  Even after the chancellor announced her ruling and the reasons for it, Deanna did not raise this point or request clarification.  As the party who had a burden of clear-and-convincing proof on this issue, Deanna may well have waived the point by failing to raise it specifically.  Alternatively, if we assume that Deanna's arguments in the chancery court were sufficient to preserve the issue, then we must also assume that the chancellor's directly responsive ruling, which used the same terminology, sufficiently addressed it.

the petition for custody. James testified that, with Deanna's permission, they saw Hayden "all through the week" and "[a]ll through summer" from April 2012 to June 2013. And beginning in June 2013 until the hearing, James and Brittany exercised court-ordered temporary visitation, first every other weekend and then three weekends a month.

¶22. The record is less clear regarding James's contact with Hayden from Hayden's birth in August 2007 until April 2012. This is because much of the testimony on the subject was general in nature or ambiguous with respect to dates. As discussed above, James was present for Hayden's birth in August 2007, but he was subsequently incarcerated for two different one-year periods.[5] Thus, the primary ambiguity in the record relates to how frequently James saw Hayden during periods that he was not incarcerated—i.e., from August 2007 to April 2008 and from April 2009 to April 2011. Deanna testified as follows:

Q. Do you have a problem with [Hayden] spending time with his parents?

A. No. . . . I've never kept [Hayden] away from any of [his] family. . . . His whole life he's always went down there to stay. To visit with them.

Her criticism of James and Brittany was that "[t]hey see [Hayden] when it's convenient for them and that's how it's always been." Deanna also testified as follows:

Q. There has been much insinuation that [James has] not been a part of [Hayden's] life.

A. I never said he hadn't been a part of his life.

Q. He's always been a part of his life --

A. He hasn't helped take care of him.

_____

[5] There was some testimony that Hayden had some visits with James while James was in the county jail between April 2011 and April 2012.

9

Q. Ok. But he's always been a part?

A. Not -- He's been in and out.

Deanna also acknowledged that James's grandparents, who raised James, had been a consistent presence in Hayden's life, even while James was incarcerated.

¶23. With respect to the issue of child support, as discussed above, it appears that an order was entered in October 2011 establishing James's paternity and requiring him to pay child support for Hayden. However, James remained incarcerated until April 2012. It appears that in June 2013, an order was entered requiring James to pay back child support. James testified that he subsequently paid $5,554 in back child support and continued to pay $180 per month at the time of the hearing.

¶24. Thus, from the time James became a father at the age of sixteen until April 2011, when his parole was revoked, he was hardly a model father or citizen. Nonetheless, applying binding precedent, we are unable to say that the chancellor manifestly or clearly erred by finding that James did not abandon or desert Hayden. In *Davis*, the father (Vaughn) had only "sporadic" interactions with his daughter (Danielle) and "contributed little financial assistance" from the time she was born until she was almost four years old. *See Davis*, 126 So. 3d at 35 (¶¶2-4). During that time, Vaughn was in school and shared an apartment with roommates. *Id.* at (¶3). Vaughn and Danielle's grandmother (Davis) "mutually agreed that [Davis] would keep Danielle until Vaughn had finished school and gotten back on his feet." *Vaughn*, 36 So. 3d at 1262 (¶2). However, Vaughn "failed to voluntarily seek custody of [Danielle] when he got back on this feet." *Id.* (quoting this Court's opinion). When Danielle

was almost four years old, Vaughn was granted biweekly visitation, which even then "he exercised inconsistently." *Id.* at 1263 (¶5). Despite Vaughn's "sporadic" contact, lack of support, and delayed efforts to regain custody, the chancellor found that he had not abandoned or deserted Danielle, and the Supreme Court affirmed. The Court stated that "whether Vaughn deserted Danielle was a factual question best left to the trial judge, and the evidence supports his ruling." *Davis*, 126 So. 3d at 39-40 (¶20).[6] The Court affirmed "[b]ecause the chancellor applied the correct legal standard and because his findings of fact were neither manifestly wrong nor clearly erroneous." *Id.* at 40 (¶20).

¶25. With respect to the issues of abandonment and desertion, there is no material distinction between Vaughn and James. Like Vaughn, James interacted with his child sporadically and provided little financial support during the early years of the child's life. But even Deanna admits that James maintained at least sporadic interaction with Hayden and always remained a part of his life. The definition of "desertion" is hardly a bright-line rule and could be said to describe James's conduct.[7] However, given that *Davis*'s facts are not materially distinguishable from the facts of this case, the Supreme Court's ruling in *Davis* compels the conclusion that the chancellor in this case did not clearly or manifestly err by finding that James had not abandoned or deserted Hayden. As the Supreme Court has

---

[6] In a prior appeal, the Supreme Court had held that Vaughn did not abandon Danielle. *See id.* at 37 (¶7) (citing *Vaughn*, 36 So. 3d at 1265 (¶12)).

[7] *See Davis*, 126 So. 3d at 39 (¶17) ("Desertion is defined as 'forsaking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty.'" (quoting *Petit v. Holifield*, 443 So. 2d 874, 878 (Miss. 1984))).

11

explained, this is "a factual question best left to the trial judge." *Davis*, 126 So. 3d at 39-40 (¶20). Moreover, to the extent that the chancellor's finding turns on conflicting testimony and the credibility of the witnesses, we are "without authority" to second-guess her ruling because "the chancellor alone" has the "authority to decide what the disputed testimony shows."[8]

¶26. Because the chancellor's factual determination is not clearly erroneous, James is entitled to custody of Hayden. As between a natural parent and a third party, the law does not authorize a "best interest" analysis unless the third party first rebuts and overcomes the natural parent presumption. *See Davis*, 126 So. 3d at 37 (¶10). Rather, the law presumes that it *is* in Hayden's best interest to be in the custody of James, his natural father. *See Hibbette v. Baines*, 78 Miss. 695, 29 So. 80, 81 (1900).

## II. Brittany

¶27. Brittany's claim for custody is subject to a different legal standard than James's claim because in July 2008 she agreed to an order voluntarily relinquishing custody of Hayden to Deanna, and she did not petition to regain custody until June 2013. Our Supreme Court has addressed specifically "the proper standard to be applied in a request for modification where the moving natural parent . . . previously relinquished custody." *Grant v. Martin*, 757 So.

---

[8] *Irle v. Foster*, 175 So. 3d 1232, 1237-38 (¶23) (Miss. 2015) ("With respect, the dissent is without authority to decide what the disputed testimony shows. That power lies with the chancellor alone, who sat as the fact-finder and heard the testimony firsthand." (brackets, quotation marks omitted)); *see also, e.g.*, *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) ("This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and 'personally evaluate the witnesses' testimony and the parties' behavior.'").

2d 264, 266 (¶9) (Miss. 2000). "[A] natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption" and "may reclaim custody of the child only upon showing *by clear and convincing evidence* that the change in custody is in the best interest of the child." *Id.* at (¶10) (emphasis added). In *Grant*, the Supreme Court reversed and remanded because the chancellor had applied a material-change-in-circumstances standard rather than the new standard announced in the Court's opinion. *See id.* at 265 (¶5). The natural mother in *Grant* first sought to regain custody almost four years after she voluntarily relinquished custody to the children's grandparents. *See id.* at 264-65 (¶¶1-3).

¶28.    The chancellor did conduct an on-the-record analysis of Hayden's best interest in which she compared Deanna and Brittany under the *Albright* factors. The chancellor also correctly noted that it would be in Hayden's best interest to live with his sister.[9] The chancellor's analysis led her to conclude that it would be in Hayden's best interest for Brittany to have custody.

¶29.    Although the chancellor conducted an *Albright* analysis, the chancellor did not apply *Grant*'s clear-and-convincing-evidence standard. Ordinarily, this would require us to remand the case for application of the correct legal standard. In this case, however, we conclude that

---

[9] *See, e.g.*, *Carson v. Natchez Children's Home*, 580 So. 2d 1248, 1257 (Miss. 1991) ("Almost as strong [as the natural parent presumption] is the imperative that siblings should not be required to live apart."); *Sparkman v. Sparkman*, 441 So. 2d 1361, 1363 (Miss. 1983) ("[A] common sense recognition of the ordinary facts of life [is] that in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of [siblings] to be separated."); *Owens v. Owens*, 950 So. 2d 202, 207 (¶15) (Miss. Ct. App. 2006) ("When other circumstances do not require the separation of children, Mississippi courts should attempt to keep siblings together.").

13

any error was harmless. Before addressing Brittany's claim for custody, the chancellor had already ruled that James was entitled to custody of Hayden, and we have now affirmed that ruling on appeal. Because James was entitled to custody as the natural parent, Deanna was no longer entitled to custody. Furthermore, James and Brittany jointly petitioned the court to grant the two of them joint legal and physical custody of Hayden, so James had clearly consented to joint custody with Brittany. Once the court granted custody of Hayden to James, Deanna no longer had a freestanding right to object to James's sharing custody of Hayden with Brittany. Accordingly, the correctness of the chancellor's *Albright* analysis of Brittany and Deanna is now moot. It necessarily follows that the chancellor's failure to apply a clear-and-convincing-evidence standard on that issue was harmless error.

### III. Grandparent Visitation

¶30. Deanna also argues that the chancellor erred by awarding her grandparent visitation of only one weekend per month, two weeks in the summer, and a week at Christmas. We affirm because, based on the circumstances at the time of the custody hearing, Deanna was not entitled to more extensive visitation under the grandparent visitation statute.

¶31. In Mississippi, "[t]here is no common-law right to grandparent visitation. The right is purely statutory and may only be considered if the statutory criteria are met." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citations omitted). In this case, the statute requires proof that the parents have "unreasonably denied the grandparent visitation rights with the child." Miss. Code Ann. § 93-16-3(2) (Rev. 2013); *see also* Deborah H. Bell, *Mississippi Family Law* § 5.09[2][b], at 132 (2005) (reasoning that section 93-16-3(2) is

"narrowly drawn" and constitutionally sound because it "requires a finding that the child's parents have unreasonably withheld visitation"). Brittany and James did not object to the grandparent visitation that the chancellor granted, and it seems clear that Hayden should continue to spend time with Deanna, so we will not disturb the chancellor's order so far as it goes. However, prior to the chancellor's ruling, James and Brittany did not have custody of Hayden, so it would have been impossible for them to have unreasonably withheld visitation from Deanna. Absent a showing that the child's parents have unreasonably withheld visitation, there is no basis for a court to order grandparent visitation under section 93-16-3(2). Accordingly, at least at this stage, Deanna's argument that she is entitled to additional visitation is without merit.

### IV. Child Support

¶32. Deanna next argues that the chancellor lacked authority to terminate James's child support obligation because the support award was entered in a separate case in favor of DHS, and DHS was never made a party to this case. We do not address this issue on the merits because Deanna lacks standing to appeal the termination of James's obligation to pay support to DHS. Even if we assume that Deanna is correct that this part of the chancellor's order is void because DHS is not a party to this case, there is nothing in the record to show that Deanna had any residual rights to the payments that James was required to make to DHS, much less rights that would have continued after James was granted custody. For this reason, we conclude that Deanna lacks standing to appeal this aspect of the chancellor's ruling. *See Myatt v. Peco Foods of Miss. Inc.*, 22 So. 3d 334, 337 (¶5) (Miss. Ct. App. 2009) (holding

that a party lacks standing to appeal when "there is no evidence that he has a considerable stake in the outcome").

## V. Birth Certificate

¶33. Finally, Deanna argues that the chancellor lacked authority to order Hayden's surname changed to Boyd because the Department of Health was not joined as a party. There is some support for Deanna's argument. *See Powell v. Crawley*, 106 So. 3d 864, 866 (¶6) (Miss. Ct. App. 2013) (citing Miss. Code Ann. § 41-57-23(1) (Supp. 2015)). However, Deanna lacks standing to appeal with respect to this issue as well. The court ordered Hayden's surname changed from Raines to Boyd. Deanna's surname is no longer Raines, as she married her longtime boyfriend and took his surname, Patrick, during the course of this proceeding. Moreover, Hayden's surname was Raines to begin with because that was Brittany's surname, not because it was Deanna's. Deanna is in no way aggrieved by the change of Hayden's surname and thus lacks standing to raise the issue on appeal.[10] The only party who might have standing to raise the issue is Brittany, but she joined in the petition to change Hayden's name. Because Deanna lacks appellate standing, we do not address the merits of this issue.[11]

---

[10] *Cf. Neely v. Welch*, No. 2014-CA-01022-COA, 2015 WL 6875082, at *8 (¶32) (Miss. Ct. App. Nov. 10, 2015) (child was given her stepfather's surname "because that was [also] her mother's last name, not as an implied grant of rights to [her stepfather]").

[11] While acknowledging that the Department of Health must be made a party to proceedings under section 41-57-23(1), the Attorney General's Office has stated that "in cases where a chancery court has ordered the Department of Health to make a correction to a birth certificate without having first made the Department a party, it is our opinion that the Department should proceed based on that court order. . . . [I]n the alternative, the Department may, in it discretion, enter an appearance and seek to intervene in the action and ask for further direction from the court." Miss. Att'y Gen. Op., 2000-0507, 2000 WL 1648437, *Thompson* (Oct. 26, 2000).

**CONCLUSION**

¶34. The chancellor did not manifestly err by finding that Deanna failed to rebut the natural parent presumption by clear and convincing evidence. Therefore, James is entitled to custody of Hayden. Furthermore, because James and Brittany petitioned to share joint physical and legal custody of Hayden, Brittany is entitled to custody as well. Any separate issues with regard to Brittany's claim for custody are therefore moot. Finally, at present there are no grounds for Deanna to seek additional grandparent visitation, and Deanna lacks standing to appeal the chancellor's rulings regarding James's child support obligations and Hayden's surname. Accordingly, we affirm the judgment of the chancery court.

¶35. **THE JUDGMENT OF THE TATE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., ISHEE AND FAIR, JJ., CONCUR. LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, J.; JAMES, J., JOINS IN PART. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY JAMES, J. GREENLEE, J., NOT PARTICIPATING.**

**LEE, C.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I believe the chancellor erred when she found that James was able to rely on the natural-parent presumption and applied an erroneous legal standard when she awarded custody to Brittany. I would reverse and remand both custody awards as well as the grandparent-visitation award. However, I agree with the majority that Deanna lacks standing to appeal the chancellor's rulings regarding James's child-support obligations and Hayden's birth certificate. Therefore, I concur in part and dissent in part.

17

## I.     James

¶37.     The only question for this Court to decide—with respect to James—is whether the chancellor erred when she found that James could rely on the natural-parent presumption.

¶38.     As stated in the majority opinion, the natural-parent presumption may be rebutted if the third party proves by clear and convincing evidence that the parent abandoned or deserted the child.[12]  "Desertion" has been defined by the Mississippi Supreme Court as "forsaking a person to whom one is legally obligated *or forsaking one's duty*."  *Hamilton v. Houston*, 100 So. 3d 1005, 1010 (¶17) (Miss. Ct. App. 2012) (citation and quotations omitted). "Desertion differs from abandonment in that abandonment has to do with the relinquishment of a right or claim, whereas desertion involves *an avoidance of a duty or obligation*."  *Id.* (citation and quotations omitted).  Furthermore, the supreme court has held that a parent's long and continuous absences, failure to exercise parental rights, and failure to fulfill parental responsibilities, which caused the child's grandparents to step in as primary caretakers, were "actions consistent with desertion."  *Id.* (quoting *Smith*, 97 So. 3d at 48 (¶16)).

¶39.     Hayden was born in August 2007, and there is scant evidence that James was involved in Hayden's life prior to April 2012 when Brittany and James started living together.  This may be attributed, in part, to the fact that James was incarcerated from April 2008 to April 2009 and April 2011 to April 2012.

---

[12] Although the chancellor did not use the word "desertion," I believe her factual findings indicate that she considered desertion as a means of rebutting the natural-parent presumption.  *See Smith v. Smith*, 97 So. 3d 43, 49 (¶17) (Miss. 2012).  The chancellor stated: "[James] did not give up his parental presumption by signing off [on] an order, and I don't think [he] gave up his parental presumption in any other manner, by abandoning the child or not being involved [in] the child's life."

¶40.    The majority states that "there is ample evidence that James regularly spent time with Hayden . . . [from] April 2012 through the July 2014 hearing[.]"  However, Deanna testified that James saw Hayden when it was "convenient for [him] and that's how it's always been."  And she also said that Hayden often ended up with his paternal great-grandparents when James had scheduled visitation.[13]

¶41.    Furthermore, James did not request visitation until he filed for custody—a decision that was made approximately two weeks after DHS obtained an order requiring him to pay back child support.  Deanna testified that James petitioned for custody only to avoid paying child support, which James denied.  James also stated, with respect to providing financially: "Whoever's with [Hayden] is whoever buys it for him that day."

¶42.    In *Hamilton,* 100 So. 3d 1005, this Court awarded custody of the child, Jaquavion, to his paternal grandparents after finding his parents' long and continuous absences and forsaking of parental rights constituted desertion.  *Id.* at 1010 (¶20).  Around the age of six months, Jaquavion began living with his paternal grandparents full-time and only saw his mother sporadically.  *Id.* at 1008 (¶4).  Although his father's listed residence was with Jaquavion's grandparents, he acknowledged living with various girlfriends more often than at his parents' house.  *Id.* at 1010 (¶18).  Furthermore, neither parent gave the financial support required to sustain Jaquavion.  *Id.* at (¶19).  The father would occasionally purchase clothing, school supplies, and food for him, but his financial support or assistance for Jaquavion's needs was, at best, sporadic.  *Id.*  "Despite the fact that both parents were, at

---

[13] Deanna also referred to Brittany.

19

least nominally, involved in Jaquavion's life, the trial clearly established the [grandparents] as Jaquavion's primary caretakers and financial supporters." *Id.* at 1008 (¶5).

¶43. Likewise, based on James's long and continuous absences and the forsaking of his parental responsibilities, I believe that there is clear and convincing evidence that James's natural-parent presumption was rebutted. James has taken "'an extended holiday from the responsibilities of parenthood,' and . . . should not now be able to claim the benefit of his status as a natural parent." *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d 424, 431-32 (¶25) (Miss. 2009) (citation omitted). Therefore, I would reverse the chancellor's finding and remand for a best-interest analysis under *Albright*.[14]

## II. Brittany

¶44. Brittany voluntarily relinquished custody of Hayden and, therefore, could not rely on the natural-parent presumption. The only question for this Court to decide—with respect to Brittany—is whether there was *clear and convincing evidence* that the chancellor's award of custody to Brittany was in Hayden's best interests.

¶45. "[A] natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, . . . may reclaim custody of the child only upon showing by clear and convincing evidence that the change in custody is in the best interest of the child." *Grant v. Martin*, 757 So. 2d 264, 266 (¶10) (Miss. 2000).

> The factors used to determine what is in the "best interest" of a child with regard to custody are: (1) the age, health, and sex of the child; (2) determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the

---

[14] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

20

willingness and capacity to provide primary child care; (4) the employment of the parents and the responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of the parent and child; (7) moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.[15]

¶46. As the majority stated, "Although the chancellor conducted an *Albright* analysis, the chancellor did not apply *Grant*'s clear-and-convincing-evidence standard." Therefore, I would reverse and remand. *See Dorman v. Dorman*, 737 So. 2d 426, 431 (¶11) (Miss. Ct. App. 1999) ("While we do not require so-called 'magic words,' we do require enough words indicative of the basis for the chancellor's decision.").

### Conclusion

¶47. The chancellor erred in finding James could rely on the natural-parent presumption and applied an erroneous legal standard in awarding custody to Brittany. Therefore, I would reverse and remand both custody awards as well as the grandparent-visitation award. In the event James and/or Brittany were granted custody on remand, I would encourage the chancellor to consider the grandparent-visitation statute as well as the *Martin*[16] factors and enter a judgment accordingly. I agree with the majority that Deanna lacks standing to appeal the chancellor's rulings regarding James's child-support obligations and Hayden's birth certificate.

**BARNES, J., JOINS THIS OPINION. JAMES, J., JOINS THIS OPINION IN**

---

[15] To be clear, "custodian(s)" should be substituted in place of "parent(s)" when applying the *Albright* factors to the facts of this particular case.

[16] *Martin v. Coop*, 693 So. 2d 912 (Miss. 1997).

PART.

**CARLTON, J., DISSENTING:**

¶48.    I respectfully dissent from the decision of the majority.   I would reverse the chancellor's award of custody to Brittany and James.  The record reflects that neither Brittany nor James was entitled to the natural-parent presumption, and the record reflects no showing of a material change of circumstances adverse to the best interests of the child by Brittany or James.[17] Brittany voluntarily relinquished temporary legal and physical custody of Hayden to her mother, Deanna, in 2008, and Deanna acquired incidents of permanency since her custody of Hayden remained unchallenged for five years.[18]  Therefore, without a material change in circumstances, the record fails to support a consideration by the chancellor of a change in custody under the *Albright* analysis.

**JAMES, J., JOINS THIS OPINION.**

---

[17] *See Grant v. Martin,* 757 So. 2d 264, 266 (¶10) (Miss. 2000) ("[A] natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption.")*; Hall v. Hall*, 134 So. 3d 822, 825 (¶9) (Miss. Ct. App. 2014) (setting forth the requirements for showing that a material change in circumstances has occurred in the custodial home); *see also Johnson v. Gray*, 859 So. 2d 1006, 1013 (¶33) (Miss. 2003); *Riley v. Doerner*, 677 So. 2d 740, 743 (Miss. 1996); *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss. 1992) ("[A]bandonment [i]s any course of conduct on the part of a parent evincing a settled purpose to forgo all duties and relinquish all parental claims to the child."); *Adams v. Johnson*, 33 So. 3d 551, 555-56 (¶¶9-10) (Miss. Ct. App. 2010).

[18] *Swartzfager v. Derrick*, 942 So. 2d 255, 258 (¶10) (Miss. Ct. App. 2006).